# YARBOROUGH, WARDEN, ET AL. *v.* GENTRY

No. 02–1597.   Decided October 20, 2003

Per Curiam.

## I

Respondent Lionel Gentry was convicted in California state court of assault with a deadly weapon for stabbing his girlfriend, Tanaysha Handy. Gentry claimed he stabbed her accidentally during a dispute with a drug dealer.

Handy testified for the prosecution. She stated that she recalled being stabbed but could not remember the details of the incident. The prosecution then confronted Handy with her testimony from a preliminary hearing that Gentry had placed his hand around her throat before stabbing her twice.

Albert Williams, a security guard in a neighboring building, testified that he saw Gentry, Handy, and another man from his third-floor window. According to Williams, Gentry swung his hand into Handy's left side with some object, causing her to lean forward and scream. Williams was inconsistent about the quality of light at the time, stating variously that it was "pretty dark" or "getting dark," that "it wasn't that dark," and that the area of the stabbing was "lighted up." See *Gentry* v. *Roe*, 320 F. 3d 891, 896–897 (CA9 2003).

Gentry testified in his own defense that he had stabbed Handy accidentally while pushing her out of the way. When asked about prior convictions, he falsely stated that he had been convicted only once; evidence showed he had been separately convicted of burglary, grand theft, battery on a peace officer, and being a felon in possession of a firearm. He attributed his error to confusion about whether a plea bargain counted as a conviction.

In her closing argument, the prosecutor expressed sympathy for Handy's plight as a pregnant, drug-addicted mother of three and highlighted her damaging preliminary hearing testimony. She accused Gentry of telling the jury a "pack of lies." See *id.*, at .897–898. Defense counsel responded with the following closing argument:

> " 'I don't have a lot. to say today. Just once I'd like to find a prosecutor that doesn't know exactly what happened. Just once I'd like to find a D. A. that wasn't there and that can tell and they can stand up here and be honest and say I don't know who is lying and who is not 'cause she wasn't there, ladies and gentlemen. [I] wasn't there. None of the 12 of you were there. None of the other people in this courtroom were there except those two people and that one guy who saw parts of it, or saw it all. Pretty dark. Dark. It was light. Those are the three versions of his testimony with regard to what he saw and what he saw. I don't know what happened. I can't tell you. And if I sit here and try to tell you what happened, I'm lying to you. I don't know. I wasn't there. I don't have to judge. I don't have to decide. You heard the testimony come from the truth chair. You heard people testify. You heard good things that made you feel good. You heard bad things *that made you feel bad.*
>
> " 'I don't care that Tanaysha is pregnant. I don't care that she has three children. I don't know why that had to be brought out in closing. What does that have to do with this case? She was stabbed.
>
> " 'The question is, did he intend to stab her? He said he did it by accident. If he's lying and you think he's lying then you have to convict him. If you don't think he's lying, bad person, lousy drug addict, stinking thief, jail bird, all that to the contrary, he's not guilty. It's as simple as that. I don't care if he's been in prison. And for the sake of this thing you ought not care because

that doesn't have anything to do with what happened on April 30th, 1994.

" 'He doesn't know whether or not he's been convicted. Didn't understand the term conviction. That is not inconsistent with this whole thing of being spoken and doing all this other crime stuff as opposed to going to school. I don't know. I can't judge the man. The reason that they bring 12 jurors from all different walks of life, let them sit here and listen to people testify, and the reason that the court will give you instructions with regard to not having your life experience, leaving it at the door, is because you can't just assume that because a guy has done a bunch of bad things that he's now done this thing.

" 'I don't know if thievery and stabbing your girlfriend are all in the same pot. I don't know if just because of the fact that you stole some things in the past that means you must have stabbed your girlfriend. That sounds like a jump to me, but that's just [me]. I'm not one of the 12 over there.

" 'All I ask you to do is to look at the evidence and listen to everything you've heard and then make a decision. Good decision or bad decision, it's still a decision. I would like all 12 of you to agree; but if you don't, I can't do anything about that either.

" 'You heard everything just like all of us have heard it. I don't know who's lying. I don't know if anybody is lying. And for someone to stand here and tell you that they think someone is lying and that they know that lying goes on, ladies and gentlemen, if that person was on the witness stand I'd be objecting that they don't have foundation because they weren't there. And that's true. The defense attorney and the prosecutor, no different than 12 of you.

" 'So I'd ask you to listen to what you've heard when you go back, ask you to take some time to think about

it, and be sure that's what you want to do, then come out and do it.

"'Thank you.'" *Id.*, at 898–899 (one paragraph break omitted).

After deliberating for about six hours, the jury convicted. On direct appeal, Gentry argued that his trial counsel's closing argument deprived him of his right to effective assistance of counsel. The California Court of Appeal rejected that contention, and the California Supreme Court denied review. Gentry's petition for federal habeas relief was denied by the District Court, but the Court of Appeals for the Ninth Circuit reversed. We grant the State's petition for a writ of certiorari and the motion for leave to proceed *in forma pauperis* and reverse.

## II

The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. That right is denied when a defense attorney's performance falls below an objective standard of reasonableness and thereby prejudices the defense. *Wiggins* v. *Smith*, 539 U. S. 510, 521 (2003); *Strickland* v. *Washington*, 466 U. S. 668, 687 (1984). If a state court has already rejected an ineffective-assistance claim, a federal court may grant habeas relief if the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U. S. C. § 2254(d)(1). Where, as here, the state court's application of governing federal law is challenged, it must be shown to be not only erroneous, but objectively unreasonable. *Wiggins, supra,* at 520–521; *Woodford* v. *Visciotti*, 537 U. S. 19, 24–25 (2002) *(per curiam); Williams* v. *Taylor*, 529 U. S. 362, 409 (2000).

The right to effective assistance extends to closing arguments. See *Bell* v. *Cone*, 535 U. S. 685, 701–702 (2002); *Herring* v. *New York*, 422 U. S. 853, 865 (1975). Nonetheless, counsel has wide latitude in deciding how best to represent

a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should "sharpen and clarify the issues for resolution by the trier of fact," *id.,* at 862, but which issues to sharpen and how best to clarify them are questions with many reasonable answers. Indeed, it might sometimes make sense to forgo closing argument altogether. See *Bell, supra,* at 701–702. Judicial review of a defense attorney's summation is therefore highly deferential—and doubly deferential when it is conducted through the lens of federal habeas.

In light of these principles, the Ninth Circuit erred in finding the California Court of Appeal's decision objectively unreasonable. The California court's opinion cited state case law setting forth the correct federal standard for evaluating ineffective-assistance claims and concluded that counsel's performance was not ineffective. That conclusion was supported by the record. The summation for the defense made several key points: that Williams's testimony about the quality of light was inconsistent; that Handy's personal circumstances were irrelevant to Gentry's guilt; that the case turned on whether the stabbing was accidental, and the jury had to acquit if it believed Gentry's version of events; that Gentry's criminal history was irrelevant to his guilt, particularly given the seriousness of the charge compared to his prior theft offenses; and that Gentry's misstatement of the number of times he had been convicted could be explained by his lack of education. Woven through these issues was a unifying theme—that the jury, like the prosecutor and defense counsel himself, were not at the scene of the crime and so could only speculate about what had happened and who was lying.

The Ninth Circuit rejected the state court's conclusion in large part because counsel did not highlight various other potentially exculpatory pieces of evidence: that Handy had

used drugs on the day of the stabbing and during the early morning hours of the day of her preliminary hearing; that Williams's inability to see the stabbing clearly was relevant to the issue of intent; that Gentry's testimony was consistent with Williams's in some respects; that the government did not call as a witness Williams's co-worker, who also saw the stabbing; that the stab wound was only one inch deep, suggesting it may have been accidental; that Handy testified she had been stabbed twice, but only had one wound; and that Gentry, after being confronted by Williams, did not try to retrieve his weapon but instead moved toward Handy while repeating, "she's my girlfriend." See 320 F. 3d, at 900–901.

These other potential arguments do not establish that the state court's decision was unreasonable. Some of the omitted items, such as Gentry's reaction to Williams, are thoroughly ambiguous. Some of the others might well have backfired. For example, although Handy claimed at trial she had used drugs before the preliminary hearing, she testified at the hearing that she was not under the influence and could remember exactly what had happened the day of the stabbing. And, although Handy's wound was only one inch deep, it still lacerated her stomach and diaphragm, spilling the stomach's contents into her chest cavity and requiring almost two hours of surgery. These are facts that the prosecutor could have exploited to great advantage in her rebuttal.

Even if some of the arguments would unquestionably have supported the defense, it does not follow that counsel was incompetent for failing to include them. Focusing on a small number of key points may be more persuasive than a shotgun approach. As one expert advises: "The number of issues introduced should definitely be restricted. Research suggests that there is an upper limit to the number of issues or arguments an attorney can present and still have persuasive effect." R. Matlon, Opening Statements/Closing Arguments 60 (1993) (citing Calder, Insko, & Yandell, The Relation of

Cognitive and Memorial Process to Persuasion in a Simulated Jury Trial, 4 J. Applied Social Psychology 62 (1974)). Another authority says: "The advocate is not required to summarize or comment upon all the facts, opinions, inferences, and law involved in a case. A decision not to address an issue, an opponent's theory, or a particular fact should be based on an analysis of the importance of that subject and the ability of the advocate and the opponent to explain persuasively the position to the fact finder." R. Haydock & J. Sonsteng, Advocacy: Opening and Closing § 3.10, p. 70 (1994). In short, judicious selection of arguments for summation is a core exercise of defense counsel's discretion.

When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect. See *Strickland*, 466 U. S., at 690 (counsel is "strongly presumed" to make decisions in the exercise of professional judgment). That presumption has particular force where a petitioner bases his ineffective-assistance claim solely on the trial record, creating a situation in which a court "may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive." *Massaro* v. *United States*, 538 U. S. 500, 505 (2003). Moreover, even if an omission is inadvertent, relief is not automatic. The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight. See *Bell*, 535 U. S., at 702; *Kimmelman* v. *Morrison*, 477 U. S. 365, 382 (1986); *Strickland, supra*, at 689; *United States* v. *Cronic*, 466 U. S. 648, 656 (1984). To recall the words of Justice (and former Solicitor General) Jackson: "I made three arguments of every case. First came the one that I planned—as I thought, logical, coherent, complete. Second was the one actually presented—interrupted, incoherent, disjointed, disappointing. The third was the utterly devastating argument that I thought of after going to bed that night." Advocacy Before the Supreme Court, 37 A. B. A. J.

801, 803 (1951). Based on the record in this case, a state court could reasonably conclude that Gentry had failed to rebut the presumption of adequate assistance. Counsel plainly put to the jury the centerpiece of his case: that the only testimony regarding what had happened that the jury heard "come from the truth chair" was conflicting; that none of his client's testimony was demonstrably a lie; and that the testimony contradicting his client came in "three versions." See 320 F. 3d, at 898. The issues counsel omitted were not so clearly more persuasive than those he discussed that their omission can only be attributed to a professional error of constitutional magnitude.

The Ninth Circuit found other flaws in counsel's presentation. It criticized him for mentioning "a host of details that hurt his client's position, none of which mattered as a matter of law." *Id.*, at 900. Of course the reason counsel mentioned those details was precisely to remind the jury that they *were* legally irrelevant. That was not an unreasonable tactic. See F. Bailey & H. Rothblatt, Successful Techniques for Criminal Trials § 19:23, p. 461 (2d ed. 1985) ("Face up to [the defendant's] defects . . . [and] call upon the jury to disregard everything not connected to the crime with which he is charged"). The Ninth Circuit singled out for censure counsel's argument that the jury must acquit if Gentry was telling the truth, even though he was a "bad person, lousy drug addict, stinking thief, jail bird." See 320 F. 3d, at 900. It apparently viewed the remark as a gratuitous swipe at Gentry's character. While confessing a client's shortcomings might remind the jury of facts they otherwise would have forgotten, it might also convince them to put aside facts they would have remembered in any event. This is precisely the sort of calculated risk that lies at the heart of an advocate's discretion. By candidly acknowledging his client's short-comings, counsel might have built credibility with the jury and persuaded it to focus on the relevant issues in the case. See J. Stein, Closing Argument § 204, p. 10 (1992–1996) ("[I]f

you make certain concessions showing that you are earnestly in search of the truth, then your comments on matters that are in dispute will be received without the usual apprehension surrounding the remarks of an advocate"). As Judge Kleinfeld pointed out in dissenting from denial of rehearing en banc, the court's criticism applies just as well to Clarence Darrow's closing argument in the Leopold and Loeb case: " 'I do not know how much salvage there is in these two boys. . . . [Y]our Honor would be merciful if you tied a rope around their necks and let them die; merciful to them, but not merciful to civilization, and not merciful to those who would be left behind.' " 320 F. 3d, at 895 (quoting Famous American Jury Speeches 1086 (F. Hicks ed. 1925) (reprint 1990)).

The Ninth Circuit rebuked counsel for making only a passive request that the jury reach some verdict, rather than an express demand for acquittal. But given a patronizing and overconfident summation by a prosecutor, a low-key strategy that stresses the jury's autonomy is not unreasonable. One treatise recommends just such a technique: "Avoid challenging the jury to find for your client, or phrasing your argument in terms suggesting what their finding must be. . . . [S]cientific research indicates that jurors will react against a lawyer who they think is blatantly trying to limit their freedom of thought." Stein, *supra*, §206, at 15.

The Ninth Circuit faulted counsel for not arguing explicitly that the government had failed to prove guilt beyond a reasonable doubt. Counsel's entire presentation, however, made just that point. He repeatedly stressed that no one—not the prosecutor, the jury, nor even himself—could be sure who was telling the truth. This is the very essence of a reasonable-doubt argument. To be sure, he did not insist that the existence of a reasonable doubt would *require* the jury to acquit—but he could count on the judge's charge to remind them of that requirement, and by doing so he would preserve his strategy of appearing as the friend of jury autonomy.

Finally, the Ninth Circuit criticized counsel's approach on the ground that, by confessing that he too could not be sure of the truth, counsel "implied that even he did not believe Gentry's testimony." 320 F. 3d, at 900. But there is nothing wrong with a rhetorical device that personalizes the doubts anyone but an eyewitness must necessarily have. Winning over an audience by empathy is a technique that dates back to Aristotle. See P. Lagarias, Effective Closing Argument §§ 2.05–2.06, pp. 99–101 (1989) (citing Aristotle's Rhetoric for the point that "[a] speech should indicate to the audience that the speaker shares the attitudes of the listener, so that, in turn, the listener will respond positively to the views of the speaker"); *id.*, § 3.03, at 112 (deriving from this principle the advice that "counsel may couch his arguments in terms of 'we,' rather than 'you, the jury' ").

To be sure, Gentry's lawyer was no Aristotle or even Clarence Darrow. But the Ninth Circuit's conclusion—not only that his performance was deficient, but that any disagreement with that conclusion would be objectively unreasonable—gives too little deference to the state courts that have primary responsibility for supervising defense counsel in state criminal trials.

\* \* \*

The judgment of the Ninth Circuit is reversed.

*It is so ordered.*